IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
**Richmond Division**

```
F I L E D
SEP 1 7 2014
CLERK, U.S. DISTRICT COURT
RICHMOND, VA
```

JAMES POWERS,            )
                            )
      Plaintiff,          )
                            )
v.                          )     Civil Action No. 3:11CV763–HEH
                            )
HAROLD CLARKE, *et al.*,   )
                            )
      Defendants.      )

## MEMORANDUM OPINION
### (Granting Defendants' Motion for Summary Judgment)

James Powers, a Virginia prisoner proceeding *pro se* and *in forma pauperis*, brings this action pursuant to 42 U.S.C. § 1983.[1] Powers is a member of the Nation of Gods and Earths ("NGE"). The Virginia Department of Corrections ("VDOC") has classified the NGE as "a gang rather than [as] a spiritual group." (Compl. ¶ 12.) In 2011, Powers wrote a letter seeking to have the VDOC recognize the NGE as a religion. (*Id.* ¶ 11.). Powers's request was denied "based on the NGE being classified [as] a gang." (*Id.* ¶ 10.) Powers contends that this classification has placed a "substantial burden on Plaintiff . . . ." (*Id.* ¶ 12.) The VDOC policy of labeling NGE as a gang precludes

---

[1] The statute provides, in pertinent part:

> Every person who, under color of any statute . . . of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law . . . .

42 U.S.C. § 1983.

Powers from receiving spiritual literature, namely *The Five Percenter Newspaper*. (*Id.*

¶ 14.) Powers names Harold Clarke, the Director of the VDOC and Layton T. Lester, the

Warden of Lunenburg Correctional Center, as defendants. Powers lists the following

claims for relief:

| Claim 1 | The Defendants' policy of labeling the NGE as a gang instead of a religion violates Powers's rights under: |
|---|---|
| | (a)  The Religious Land Use and Institutionalized Persons Act ("RLUIPA");[2] |
| | (b)  The Free Exercise Clause of the First Amendment;[3] |
| | (c)  The Establishment Clause of the First Amendment; and, |
| | (d)  The Equal Protection Clause of the Fourteenth Amendment.[4] |

| Claim 2 | "The Defendants failure to comply with [VDOC] regulation requiring them to process request for DOC recognition of religion form violated James Powers' rights under . . . :" (*Id.* ¶ 21.)[5] |
|---|---|
| | (a)  RLUIPA; |
| | (b)  The Free Exercise Clause of the First Amendment; |
| | (c)  The Establishment Clause of the First Amendment; and, |
| | (d)  The Equal Protection Clause of the Fourteenth Amendment. |

| Claim 3 | "The Defendant Harold Clarke by upholding and enforcing a blanket ban on publications and literature relating to the Nation of Gods and Earths violates plaintiff James Powers' rights under . . . :" (*Id.* ¶ 22.) |
|---|---|
| | (a)  RLUIPA; |
| | (b)  The Free Exercise Clause of the First Amendment; |
| | (c)  The Establishment Clause of the First Amendment; and, |
| | (d)  The Equal Protection Clause of the Fourteenth Amendment. |

---

[2] Religious Land Use and Institutionalized Persons Act ("RLUIPA") of 2000, 42 U.S.C. §§ 2000cc *et seq.*

[3] "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ." U.S. Const. amend. I.

[4] "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

[5] The Court has corrected the capitalization in the quotations to Powers's submissions.

The matter is before the Court on Defendants' Motion for Summary Judgment and the Court's obligation to dismiss inadequate or frivolous claims by prisoner pursuant to 28 U.S.C. § 1915(e)(2).

## I. Review Under The Prison Litigation Reform Act

Pursuant to the Prison Litigation Reform Act ("PLRA") this Court must dismiss any action filed by a prisoner if the Court determines the action (1) "is frivolous" or (2) "fails to state a claim on which relief may be granted." 28 U.S.C. § 1915(e)(2); *see* 28 U.S.C. § 1915A. The first standard includes claims based upon "'an indisputably meritless legal theory,'" or claims where the "'factual contentions are clearly baseless.'" *Clay v. Yates*, 809 F. Supp. 417, 427 (E.D. Va. 1992) (quoting *Neitzke v. Williams*, 490 U.S. 319, 327 (1989)). The second standard is the familiar standard for a motion to dismiss under Fed. R. Civ. P. 12(b)(6).

"A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992) (citing 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1356 (1990)). In considering a motion to dismiss for failure to state a claim, a plaintiff's well-pleaded allegations are taken as true and the complaint is viewed in the light most favorable to the plaintiff. *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993); *see also Martin*, 980 F.2d at 952. This principle applies only to factual allegations, however, and "a court considering a motion to dismiss can choose to begin

by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

The Federal Rules of Civil Procedure "require[ ] only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (second alteration in original) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). Plaintiffs cannot satisfy this standard with complaints containing only "labels and conclusions" or a "formulaic recitation of the elements of a cause of action." *Id.* (citations omitted). Instead, a plaintiff must allege facts sufficient "to raise a right to relief above the speculative level," *id.* (citation omitted), stating a claim that is "plausible on its face," *id.* at 570, rather than merely "conceivable." *Id.* "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Bell Atl. Corp.*, 550 U.S. at 556). In order for a claim or complaint to survive dismissal for failure to state a claim, therefore, the plaintiff must "allege facts sufficient to state all the elements of [his or] her claim." *Bass v. E.I. DuPont de Nemours & Co.*, 324 F.3d 761, 765 (4th Cir. 2003) (citing *Dickson v. Microsoft Corp.*, 309 F.3d 193, 213 (4th Cir. 2002); *Iodice v. United States*, 289 F.3d 270, 281 (4th Cir. 2002)).

Lastly, while the Court liberally construes *pro se* complaints, *Gordon v. Leeke*, 574 F.2d 1147, 1151 (4th Cir. 1978), it will not act as the inmate's advocate and develop, *sua sponte*, statutory and constitutional claims that the inmate failed to clearly raise on

the face of his complaint. *See Brock v. Carroll*, 107 F.3d 241, 243 (4th Cir. 1997) (Luttig, J., concurring). Nor is the Court obliged "to construct full-blown claims from sentence fragments." *Beaudett v. City of Hampton*, 775 F.2d 1274, 1278 (4th Cir. 1985). "Even *pro se* plaintiffs must recognize Rule 8's vision for 'a system of simplified pleadings that give notice of the general claim asserted, allow for the preparation of a basic defense, narrow the issues to be litigated, and provide a means for quick dispositions of sham claims.'" *Sewraz v. Guice*, No. 3:08cv35, 2008 WL 3926443, at *1 (E.D. Va. Aug. 26, 2008) (quoting *Prezzi v. Berzak*, 57 F.R.D. 149, 151 (S.D.N.Y. 1972)), *aff'd*, 318 F. App'x 228, 228 (4th Cir. 2009).

Powers's Complaint is hardly a model of clarity. For example, Powers repeatedly claims that Defendants' actions violated the Establishment Clause. "The Establishment Clause prohibits state action with a sectarian legislative purpose or with the primary effect of advancing religion, including fostering an 'excessive government entanglement' with religion." *Glassman v. Arlington Cnty.*, 628 F.3d 140, 146 (4th Cir. 2010) (quoting *Lemon v. Kurtzman*, 403 U.S. 602, 612–13 (1971)). In his Complaint, Powers fails to articulate how Defendants' actions implicate, much less violate, the Establishment Clause. Accordingly, Claims 1(c), 2(c), and 3(c) will be dismissed without prejudice.

In Claims 2(a), 2(b), and 2(d), Powers contends that, "Defendants['] failure to comply with [VDOC] regulation requiring them to process request for DOC recognition of religion form violated James Powers' rights under" RLUIPA, the Free Exercise Clause, and the Equal Protection Clause. (Compl. ¶ 21.) These claims appear to be redundant of the RLUIPA and Free Exercise claims set forth in Claims 1 and 3. Powers

fails to articulate how the processing of his paperwork gives rise to a distinct violation of his rights under the above provisions. *See Coward v. Jabe*, No. 1:10CV147, 2014 WL 932514, at *1–3 (E.D. Va. Mar. 10, 2014) (grouping for purposes of analysis inmate's claims that "defendants wrongly refused to recognize NGE as a religion and failed to follow proper internal procedures in doing so"); *Versatile v. Johnson*, No. 3:09CV120, 2011 WL 5119259, at 28–29 (E.D. Va. 2011). Accordingly, Claims 2(a) and 2(b) will be dismissed without prejudice to the litigation of the RLUIPA and Free Exercise claims set forth in Claims 1 and 3.

Powers has filed a "Motion to Compel" (ECF No. 52), wherein he complains that Defendants failed to acknowledge and address all of the claims he raised in his Complaint. Defendants respond that they "did not address the issues under the Establishment or Equal Protection Clauses in that the facts as alleged do not raise any issue or argument for either." (Resp. Mot. Compel 1, ECF No. 53.) The Court notes that, to the extent that Defendants contend that Powers failed to state a proper claim under the above provisions, they should have moved to dismiss rather than simply ignore the claims.[6] Accordingly, the Motion to Compel (ECF No. 52) is granted in part, to the extent that, within twenty (20) days of the date of entry hereof, Defendants shall file a Motion for Summary Judgment addressing Claims 1(d), 2(d), and 3(d).

---

[6] In his Complaint, Powers contends that the VDOC policy "against the NGE is racially motivated . . . ." (Compl. ¶ 15.) Powers further alleges that, "[i]t can be inferred that the [VDOC] policy is discriminatory against a spiritual system and cultural way of living that[']s non-Euro-centric in its expression." (*Id.*)

## II. Motion for Summary Judgment

With respect to Powers's RLUIPA and Free Exercise claims, Defendants assert

these claims must be dismissed because, *inter alia*: (1) Powers fails "to demonstrate that

he holds a sincere *religious* belief in the NGE"; (Mem. Supp. Mot. Summ. J. 8); (2)

Powers fails to demonstrate that Defendants' actions have substantially burdened his

religious exercise (*see id.* at 12); and, "even if NGE could be considered a religion and if

VDOC's actions and policies were to constitute a substantial burden, VDOC uses the

least restrictive means of furthering the compelling governmental interest of prison

security." (*Id.* at 13.) For the reasons set forth below, the Court grants Defendants'

Motion for Summary Judgment because although they have substantially burdened

Powers's religious exercise, Defendants' actions constitute the least restrictive means of

furthering the compelling governmental interest in prison security. Given the foregoing

conclusions, the Court's recitation of facts focuses on these issues.

### A.    Standard for Summary Judgment

Summary judgment must be rendered "if the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter

of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment bears the

responsibility of informing the Court of the basis for the motion and identifying the parts

of the record which demonstrate the absence of a genuine issue of material fact. *See*

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[W]here the nonmoving party will

bear the burden of proof at trial on a dispositive issue, a summary judgment motion may

properly be made in reliance solely on the pleadings, depositions, answers to

7

interrogatories, and admissions on file." *Id.* at 324 (internal quotation marks omitted).

When the motion is properly supported, the nonmoving party must go beyond the

pleadings and, by citing affidavits or "'depositions, answers to interrogatories, and

admissions on file,' designate 'specific facts showing that there is a genuine issue for

trial.'" *Id.* (quoting former Fed. R. Civ. P. 56(c), (e) (1986)). In reviewing a summary

judgment motion, the Court "must draw all justifiable inferences in favor of the

nonmoving party." *United States v. Carolina Transformer Co.*, 978 F.2d 832, 835 (4th

Cir. 1992) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). However,

a mere "'*scintilla* of evidence'" will not preclude summary judgment. *Anderson*, 477

U.S. at 251 (quoting *Improvement Co. v. Munson*, 81 U.S. (14 Wall.) 442, 448 (1872)).

Moreover, not all disputes of fact preclude summary judgment. Instead, "the

requirement is that there be no *genuine* issue of *material* fact." *Id.* at 248. With respect

to materiality, "[o]nly disputes over facts that might affect the outcome of the suit under

the governing law will properly preclude the entry of summary judgment." *Id.* As to

genuineness, the nonmoving party "must produce . . . evidence that creates a fair doubt;

wholly speculative assertions will not suffice." *Bongam v. Action Toyota, Inc.*,

14 F. App'x 275, 280 (4th Cir. 2001) (citation omitted) (internal quotation marks

omitted). "A motion for summary judgment may not be defeated by evidence that is

'merely colorable' or 'is not sufficiently probative.'" *M & M Med. Supplies & Serv., Inc.*

*v. Pleasant Valley Hosp., Inc.*, 981 F.2d 160, 163 (4th Cir. 1993) (quoting *Anderson*, 477

U.S. at 249–50). Thus, the nonmoving party cannot "'create a genuine dispute of fact

through mere speculation.'" *Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008)

(quoting *Beale v. Hardy*, 769 F.3d 213, 214 (4th Cir. 1985)).  Nor will mere

"'metaphysical doubt as to the material facts'" create a genuine dispute.  *Id.* (quoting

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

Accordingly, "[t]he nonmovant can show that a dispute is genuine only if it provides

sufficient evidence so that a 'reasonable jury could return a verdict for the nonmoving

party.'"  *Wiggins v. DaVita Tidewater LLC*, 451 F. Supp. 2d 789, 796 (E.D. Va. 2006)

(quoting *Anderson*, 477 U.S. at 248).

In support of their Motion for Summary Judgment, Defendants offer the affidavits

of the following individuals: L.B. Cei, Operations Support Manager for the VDOC ("Cei

Aff."); J. Randy Myers, President of Chaplain Service Prison Ministry of Virginia, Inc.

("Myers Aff."); Gary J. Clore, Manager of the VDOC Gang Management Unit with the

VDOC ("Clore Aff."); Michael Duke, Gang Specialist in the Gang Management Unit for

VDOC ("Duke Aff."); and Layton T. Lester, Warden of Lunenburg Correctional Center

("Lester Aff.").

In Response to the Motion for Summary Judgment,[7] Powers, himself, submitted

four (4) separate personally sworn statements (Resp. Mot. Summ. J. Ex. H–K), in

addition to a sworn statement from Lord Manifest Allah (*id.* Ex. K, ECF No. 56–4, at 3-

7), a sworn statement from Floyd Jacobs (*id.* Ex. L, ECF No. 56–5), a sworn statement

from Timothy Watson (*id.* Ex. M, ECF No. 56–6), a sworn declaration from Adonay

Sword Yada Al-Ali Father Allah (*id.* Ex. ECF No. 56–7, Ex. N ), a sworn declaration

---

[7] The Court employs the pagination assigned by the CM/ECF docketing system for Powers's
Response to the Motion for Summary Judgment.

from John Hargraves (*id.* ECF No. 56–8, at 2, Ex. O), a sworn statement from James
Wilson (*id.*, ECF No. 56–8, at 3), and a sworn statement from Malik Khabir Muhammad,
(*id.*, ECF No. 56–8, at 4). Additionally, Powers attached to some of these affidavits a
newspaper article and correspondence from VDOC officials. Also, in response to the
Motion for Summary Judgment, Powers occasionally references exhibits that he
submitted with his Complaint. Finally, Powers submitted a book titled, *Knowledge of
Self.* (ECF No. 57.)

As noted above, Powers has submitted a host of sworn statements. Nevertheless,
"'Rule 56 does not impose upon the district court a duty to sift through the record in
search of evidence to support a party's opposition to summary judgment.'" *Forsyth v.
Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994) (quoting *Skotak v. Tenneco Resins, Inc.*, 953
F.2d 909, 915 n.7 (5th Cir. 1992)); *see* Fed. R. Civ. P. 56(c)(3) ("The court need consider
only the cited materials . . . ."). Instead, "[t]he party opposing summary judgment is
required to identify specific evidence in the record and to articulate the precise manner in
which that evidence supports his or her claim." *Ragas v. Tenn. Gas Pipeline Co.*, 136
F.3d 455, 458 (5th Cir. 1998) (citing *Forsyth*, 19 F.3d at 1537). Thus, in assessing the
propriety of summary judgment, the Court largely relies upon the specific evidence
identified by Powers in his Response to the Motion for Summary Judgment. In light of
the foregoing principles and submissions, the following facts are established for purposes
of summary judgment.

### B.     Pertinent Undisputed Facts

### 1.     General Background on the Beliefs of the NGE

James Powers is a member of the Nation of God and Earths, otherwise known as

the Five Percenters. (Resp. Mot. Summ. J. Ex. H, at 1; Duke Aff. ¶ 3.)[8] "The Five

Percenters are a separatist group that teaches racism. . . . [T]heir organization claims they

are a 'cultural way of life.' They believe that the black man is ALLAH (*A*rm, *L*eg, *L*eg,

*A*rm, *H*ead)/God and that the white man is the devil." (Duke Aff. ¶ 4; *see* Resp. Mot.

Summ. J. Ex. H, at 2 ("GOD [is] – the Asiatic Blackman.").)[9] Duke explains:

> The Enlightener is the teacher. This person knows the Supreme
> Mathematics, the Supreme Alphabets, and the Book of Knowledge/120
> Degrees and teaches it to the Newborns, the new recruits to the Five
> Percenters. When the Newborn memorizes the Supreme Mathematics,
> Supreme Alphabets, and Book of Knowledge/120 Degrees he becomes the
> Enlightener and in turn recruits others.

(Duke Aff. ¶ 4.) "The Five Percenters . . . do not believe in a 'mystery god'" (*id.*), rather

"[t]he NGE interpretation of God (Allah) . . . understand[s] the corporeal existence of

---

[8] Powers contends that the VDOC should refer to his religious sect as the NGE, rather than as the
Five Percent or the Five Percenters. (Resp. Mot. Summ. J Ex. J, at 2.) Powers fails to
demonstrate this choice of nomenclature is material for purposes of the Motion for Summary
Judgment and the Court uses both names interchangeably.

[9] Powers' "general averments that NGE is not racist do not alter the Court's decision. Where, as
here, the specific materials 'promote [racial] supremacy and encourage[ ] contempt
and denigration of other races' and religions, an assertion that the religion or belief system
'*generally* . . . does not encourage racist or violent behavior' is irrelevant to whether officials
may ban the offensive materials." *Versatile v. Johnson*, No. 3:09CV120, 2011 WL 5119259, at
*27 n.21 (E.D. Va. Oct. 27, 2011) (omission in original) (quoting *Wood v. Me. Dep't of Corr.*,
1:06cv156, 2008 WL 2222037, at *2 (D. Me. May 22, 2008)).

God." (Resp. Summ. J. Ex. H, at 7.)[10] "In addition to teaching the racial superiority of black males, the Five Percenters offer offenders 'brotherhood' and 'protection.'" (Duke Aff. ¶ 4.)

"The goal of the Five Percenters is to teach a system of 'secret knowledge' that a particular race of people is superior to all others and therefore should rightfully rule over all human beings." (Myers Aff. ¶ 5(a).) "What the Five Percenters refer to as their teachings or lessons are contained in the Supreme Mathematics, the Supreme Alphabets, and the Book of Knowledge/120 Degrees." (Duke Aff. ¶ 5; Resp. Summ. J. Ex. H, at 1–2.) "The study of the Supreme Mathematics and Supreme Alphabet [provides] the 'knowledge, wisdom, and understanding' of this racial superiority and to help the black man have 'power' to achieve domination . . . ." (Myers Aff. ¶ 5(a).) "Membership as a Five Percenter is proven to another by their familiarity with these materials. The only way for other Five Percenters to know who is truly a Five Percenter is to recite these teachings of the mathematics, alphabet, and the Book of Knowledge/120 Degrees." (Duke Aff. ¶ 5.) VDOC officials contend familiarity with the mathematics and alphabets allows the Five Percenters "to communicate in a form of code." (*Id.*)[11]

---

[10] The Five Percenters "describe Allah as being the complete 'enlightened' black man, who is in fact a god. They do not worship a higher power. They themselves are the highest power." (Clore Aff. ¶ 10(c).)

[11] "If one is not well versed in the mathematics and alphabets he would not understand the communication" between Five Percenters. (Duke Aff. ¶ 6) "For example, if two Five Percenter offenders were discussing guns, such as a Mac 11, they might refer to it as a Mac Knowledge Knowledge (using the mathematics in code). Another example would be if a Five Percenter was warning another Five Percenter that a Correctional Officer was approaching he may say C Cipher (using the alphabet in code)." (*Id.*)

## 2.   VDOC Concerns Regarding Gangs

"The VDOC has a policy of zero tolerance for any inappropriate or criminal behavior committed by individuals or groups of individuals.  This zero tolerance policy includes gang activities, as defined in [VDOC] policies as well as Virginia Code Section 18.2–46.1 et seq.[[12]]"  (Clore Aff. ¶ 5.)[13]  "[G]ang activity presents security problems within the VDOC prisons.  Within the facilities, gangs have been known to cause planned disturbances, riots, drug distribution, money laundering through offender trust accounts, work stoppages and violent assaults." (*Id.* ¶ 6.)  Accordingly, the VDOC

> offender population is prohibited from joining, recruiting for, associating with, participating in, or acting in concert with any individual or group of individuals who may constitute a gang.  Furthermore, the offender population is prohibited from owning, creating, possessing, or passing to

---

[12] That statute provides, in pertinent part:

> "Criminal street gang" means any ongoing organization, association, or group of three or more persons, whether formal or informal, (i) which has as one of its primary objectives or activities the commission of one or more criminal activities; (ii) which has an identifiable name or identifying sign or symbol; and (iii) whose members individually or collectively have engaged in the commission of, attempt to commit, conspiracy to commit, or solicitation of two or more predicate criminal acts, at least one of which is an act of violence, provided such acts were not part of a common act or transaction.

Va. Code. Ann. § 18.2–46.1 (West 2014).

[13] VDOC Operating Procedure § 803.2.III provides the following, broader definition of a gang:

> **Gang** – A group of individuals who: (a) possess common characteristics that distinguish them from other offenders or groups of offenders and who, as an entity, pose a threat to the safety and security of staff, the facility, other offenders or the community; (b) have a common distinctive goal, symbolism or philosophy; (c) possess identifiable skills or resources, or engage in unauthorized/illegal activities.  Criminal street gangs, hate groups, and cults that meet these conditions are considered gangs.

(Cei Aff. Encl. E § 8.02.III.)

others any correspondence, documents, drawings, or symbols of any type
that might indicate gang involvement.

(*Id.* ¶ 7.) "If an offender is in possession of gang materials, they are confiscated and the

offender is charged with possession of gang related materials. As with other gangs,

visibility is strength: the more visible a gang becomes the stronger it gets." (Duke

Aff. ¶ 6.)

Within the VDOC, groups that "have no sincere religious purpose, e.g. gangs and

racist groups, will vie for a religious designation in an effort to manipulate their way into

greater rights and privileges." (Cei Aff. ¶ 6.) Therefore, the Faith Review Committee

and its chairman, L.B. Cei, review offender requests for recognition of their religion.

(Meyers Aff. ¶¶ 3–4.) "This procedure is the means by which [the VDOC] can avoid

these non-religious organizations or groups from gaining rights of assembly and lawful

possession of what would otherwise be prohibited gang materials." (Cei Aff. ¶ 6 (citation

omitted).)

### 3.     The VDOC's Classification of the Five Percenters as a Gang

In the early 1990s, Clore supervised the Five Percenter group meetings at

Powhatan Correctional Center. (Clore Aff. ¶ 9.) Clore swears that the group acted as a

paramilitary organization. (*Id.*) The group marched, participated in exercise drills

similar to military drills, practiced defensive tactics and altered "their state issued

clothing to better identify who was a part of the Five Percenters and to show unity among

the group." (*Id.*) "In the early 1990's the Five Percenters were the dominant gang" in the

VDOC. (Duke Aff. ¶ 8.)

14

The Department of Homeland Security has acknowledged that the Five Percenters

are a "security threat group." (Clore Aff. ¶ 8.) The VDOC has classified the Five

Percenters as a gang and not a religion. [14]  (*Id.* ¶ 10; Myers Aff. ¶¶ 4–6.) The VDOC

made the determination that the Five Percenters constituted a gang, which was

> disruptive to the safe, secure and orderly operation of VDOC facilities . . . .
> [Because] [t]hey have participated in work stoppages and small riots, have
> threatened staff ([a]n offender at Red Onion State Prison kicked an officer
> in the chest and the resulting shakedown of his cell revealed documents that
> stated he wanted to hurt staff.), recruited other offenders for their gang (an
> offender at Powhatan generated and distributed materials being used to
> recruit members), and have taken over authorized religious services at
> prisons . . . .

(Clore Aff. ¶ 10(a).) Additionally, the Five Percenters "stress black supremacy

throughout their lessons. They teach the black man is god and the white man is the devil

and he is not to be trusted or obeyed." (*Id.* ¶ 10(d).)[15]

"Since the ban on group meetings and teaching materials, the number [of Five

Percenters within the VDOC has] dropped tremendously along with the incidents

involving Five Percenters." (Duke Aff. ¶ 8.)

Nevertheless, even with the ban on group meetings, some problems with Five

Percenters have persisted:

---

[14] Because the Court assumes Powers's adherence to NGE beliefs constitutes a religious exercise for purposes of the RLUIPA and the First Amendment, it is unnecessary to recite all the facts behind the VDOC's determination that the NGE is not a religious group. However, the VDOC's determination that the NGE is not a religion is based, in part, on "[t]he Five Percenters' periodical publications, which are distributed nationwide [and] insist that they are *not* a religion." (Clore Aff. ¶ 11.)

[15] Powers contests the Defendants' use of the term "recruit" with respect to persuading inmates to join the NGE. Powers, however, fails to dispute that NGE members "attempt to proselytize or convert, but only among one racial group and only for the purpose of becoming more powerful as a group and dominating others in society." (Myers Aff. ¶ 5(d).)

> There was an incident at Sussex II State Prison (Sussex II) where Five
> Percenters took over the Rastafarian program there.  When the group met
> they would break off into separate groups.  There was no organized
> religious service being conducted.  It was documented that the members
> who participated in this group had been classified as Five Percenters and
> Bloods.

(*Id.* ¶ 9.)[16]  "In 2007, a self-proclaimed Five Percenter incited a group demonstration

during the Rastafarian Program at Sussex II.  In 2009, . . . a self-proclaimed Five

Percenter assaulted and stabbed a white offender in the chow hall" at the Keen Mountain

Correctional Center.  (*Id.* ¶ 10.)

### 4.   Facts Regarding NGE Literature

Defendants state that because the "[NGE]/Five Percenters has been designated as a

gang, any literature of that group is strictly prohibited for possession by offenders."  (Cei

Aff. ¶ 9.)  Defendants qualify that statement and specify that despite labeling the NGE as

a gang, "[t]he VDOC has not placed a 'blanket ban' on all publications and literature of

the [NGE]/Five Percenters.  Publications are reviewed on an individual basis unless

specifically listed on the disapproved publications list."  (*Id.*)  For example, VDOC

Operating Procedure § 803.2.V.J, at F prohibits possession of by offenders of "[m]aterial

that depicts, describes, or promotes gang bylaws, initiations, organizational structure,

codes, or other gang-related activity or association."  (*Id.* Encl. F § 8.03.2.V.J, at F.)

Therefore, VDOC officials have reviewed the NGE literature requested by Powers and

---

[16] "There are currently 1175 known Five Percenters and 5,107 Bloods[, the largest gang in the
VDOC].  The Five Percenters are currently the third largest gang identified by the VDOC."
(Duke Aff. ¶ 8.)  The "VDOC has documented attempts by Five Percenters to recruit Bloods and
attempts by the Bloods to recruit the Five Percenters."  (*Id.*)

denied his requests to possess the material after determining on an individual basis that

the literature conflicted with VDOC Operating Procedure 803.2.V.J, at F.  (Compl. Ex. E,

at 7 (as paginated by the CM/ECF docketing system); ECF No. 57, at 2.)

### C.    Analysis

#### 1.    RLUIPA

RLUIPA provides, in pertinent part, that:

> No government shall impose a substantial burden on the religious
> exercise of a person residing in or confined to an institution . . . unless the
> government demonstrates that imposition of the burden on that person—
> (1) is in furtherance of a compelling governmental interest; and
> (2) is the least restrictive means of furthering that compelling governmental
> interest.

42 U.S.C. § 2000cc-l(a).  Thus, to begin, Powers must demonstrate that Defendants'

policies impose a "substantial burden" on his religious exercise.  In determining if

Powers has met this standard, the Court must answer two questions: "(1) Is the burdened

activity 'religious exercise,' and if so (2) is the burden 'substantial'?" *Adkins v. Kaspar*,

393 F.3d 559, 567 (5th Cir. 2004); *see Couch v. Jabe*, 679 F.3d 197, 200–01 (4th Cir.

2012) (employing similar two-part inquiry).

#### a.    Substantial Burden on Religious Exercise

"RLUIPA defines the term 'religious exercise' broadly to include 'any exercise of

religion, whether or not compelled by, or central to, a system of religious belief.'"

*Couch*, 679 F.3d at 200 (quoting 42 U.S.C. § 2000cc–5(7)(A)).  RLUIPA fails to define

the term substantial burden.  *See id.*  The United States Court of Appeals for the Fourth

Circuit has determined that the Supreme Court's jurisprudence interpreting the Free

17

Exercise Clause provides guidance on the issue. *See Lovelace v. Lee*, 472 F.3d 174, 187

(4th Cir. 2006). Thus, the Fourth Circuit has explained that a substantial burden

> is one that put[s] substantial pressure on an adherent to modify his behavior
> and to violate his beliefs, or one that forces a person to choose between
> following the precepts of h[is] religion and forfeiting [governmental]
> benefits, on the one hand, and abandoning one of the precepts of h[is]
> religion . . . on the other hand.

*Couch*, 679 F.3d at 200 (alterations and omission in original) (quoting *Lovelace*, 472 F.3d

at 187). In conducting the substantial burden inquiry, the plaintiff "is not required . . . to

prove that the exercise at issue is required by or essential to his religion." *Krieger v.*

*Brown*, 496 F. App'x 322, 325 (4th Cir. 2012) (citing *Cutter v. Wilkinson*, 544 U.S. 709,

725 n.13 (2005)). Nevertheless, "at a minimum the substantial burden test requires that a

RLUIPA plaintiff demonstrate that the government's denial of a particular religious . . .

observance was more than an inconvenience to one's religious practice." *Smith v. Allen*,

502 F.3d 1255, 1278 (11th Cir. 2007) (citing *Midrash Sephardi, Inc. v. Town of Surfside*,

366 F.3d 1214, 1227 (11th Cir. 2004));[17] *see Krieger*, 496 F. App'x at 326 (affirming

grant of summary judgment where inmate failed to "show that the deprivation of an

outdoor worship circle and the requested sacred items modified his behavior and violated

his religious beliefs" (citing *Lovelace*, 472 F.3d at 187)).

Powers swears that the VDOC labeling of NGE as a gang has substantially

burdened his religious exercise in his ability to study NGE literature and congregate with

other NGE members to discuss their beliefs. (Compl. Ex. G, at 2–3.) Specifically,

---

[17] In *Sossamon v. Texas*, 131 S. Ct. 1651, 1663 (2011), the Supreme Court abrogated *Smith*'s
ultimate holding that RLUIPA allows for monetary damages against state officials acting in their
official capacity.

Powers swears that, "[a]s an adherent of the NGE teachings, the studying of our Lessons,[18] the Five Percenter newspaper, other NGE periodicals, and Plus degrees written by NGE adherents: as well as the ability to congregate and discuss issues about our way of life is *paramount* to *learning* and *understanding* the NGE ethos and creative motifs." (*Id.*) For purposes of this Motion for Summary Judgment, Powers has established that Defendants' actions have substantially burdened his religious exercise with respect to his ability to study NGE literature and congregate with other NGE members.[19]

### b.   Least Restrictive Means of Furthering a Compelling Governmental Interest

Even though Defendants' actions impose a substantial burden on Powers' religious exercise with respect to his ability to study NGE literature and to congregate, those actions pass muster under RLUIPA because they constitute the least restrictive means of furthering a compelling state interest. 42 U.S.C. § 2000cc-l(a)(2).[20] "Giving due deference to [D]efendants' experience and expertise, *see Cutter*, 544 U.S. at 723, the

---

[18] Powers explains that, "[t]he *central tenets* in our God-centered culture is the 120 degrees aka The Lessons. These degrees are our Quran and Bible, and there is no *substitute* for them. The NGE *pray* and *meditate* by studying our *Lessons*. There is no alternative route to attain the NGE *state of mind*." (Compl. Ex. G, at 3.)

[19] Powers, however, fails to demonstrate that Defendants' actions have otherwise substantially burdened his religious exercise. Specifically, in response to the Motion for Summary Judgment, Powers fails to "identify specific evidence in the record and . . . articulate the precise manner in which that evidence" supports his assertion that Defendants have otherwise substantially burdened his religious exercise. *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998) (citation omitted).

[20] The Honorable Leonie M. Brinkema, United States District Judge, recently reached the same conclusion about the VDOC policies with respect to the NGE on a nearly identical record. *Coward v. Jabe*, No 1:10CV147, 2014 WL 932514, at *4–7 (E.D. Va. Mar. 10, 2014).

Court concludes that [the VDOC's] classification of NGE as a gang is eminently reasonable." *Coward*, 2014 WL 932514, at *5. Defendants have produced evidence that, in the past, the NGE operated as a paramilitary organization, participated in work stoppages and small riots, have threatened staff, recruited other offenders for their gang, and have taken over authorized religious services at prisons. (Clore Aff. ¶ 10(a).) As one court recently observed, "[w]hether or not NGE is considered a bona fide religion, it has acted as a prison gang that would pose a threat to the safety and security of VDOC prison facilities if treated as other religious groups. Inmates affiliated with NGE have a demonstrated history of violence and racism." *Allah v. Virginia*, No. 2:12CV00033, 2014 WL 1669331, at *2 (W.D. Va. Apr. 28, 2014). Given the foregoing history, prohibiting NGE members from congregating and possessing NGE literature furthers a compelling interest in prison security. *Versatile v. Johnson*, No. 3:09CV120, 2011 WL 5119259, at *27 (E.D. Va. Oct. 27, 2011) ("VDOC has demonstrated a compelling interest in preventing security risks posed by unrestricted access to NGE materials which promote racial and religious animosity, incite violence, or encourage gang activity."). Furthermore, for the reasons discussed more fully below, Defendants' actions constitute the least restrictive means of furthering that compelling state interest.

Defendants persuasively argue that, "[a]s with other gangs, visibility is strength: the more visible a gang becomes the stronger it gets." (Duke Aff. ¶ 6.) Permitting congregational meetings of NGE members would frustrate the VDOC's zero tolerance for gangs or gang activity. Additionally, the NGE's racist sentiments and prior history of

violence at meetings supports the Defendants' position for precluding any authorized

meetings for NGE members. As was the case in *Coward*,

> [b]y restricting group meetings and teaching materials, the VDOC has
> succeeded in causing NGE's membership to "drop [ ] tremendously[,]
> along with the [number of] incidents involving" NGE members. Duke Aff.
> ¶ 8. In addition, there is no less restrictive means of accomplishing this
> goal because the number of NGE members in VDOC facilities still exceeds
> one thousand, *id.*, and their relative strength makes it impossible for the
> VDOC to adopt comparatively incremental measures. Significantly,
> plaintiff offers no evidence to rebut any of these points.

*Coward*, 2014 WL 932514, at *5 (alterations in original). Powers fails to point to

evidence from which a reasonable juror could conclude that the VDOC could

accommodate his desire to congregate with other NGE members without frustrating the

VDOC's compelling interest in zero tolerance for gang activity.

Defendants further demonstrate that precluding possession of NGE literature is the

least restrictive means of furthering their compelling interest in prison security. *Id.* at *6;

*see Allah*, 2014 WL 1669331, at *10. Duke notes that permitting Five Percenters to

possess their NGE materials, but maintaining them within segregated confinement with

the VDOC, "would not work for the VDOC because the number of known Five

Percenters is so large. [VDOC] institutions would not have room in segregation for the

disruptive offenders which would then cause other security concerns within the

facilities." (Duke Aff. ¶ 7.) Moreover, redaction of offensive materials from NGE

literature would not be feasible, due to high labor costs. Therefore, publications in the

VDOC are either approved or disapproved in their entirety. (Cei Aff. Encl. E §

803.2.V.E.7.) Defendants have demonstrated that the current restrictions they place on

possession of NGE related literature is the least restrictive means of promoting their compelling interest in zero tolerance for gang related activity and promoting prison security. *See Allah*, 2014 WL 1669331, at *10 ("VDOC has demonstrated that its ban on NGE materials and its *de novo* review of the NGE periodical *The Five Percenter* employs the least restrictive means possible to further a compelling interest in prison security."); *Coward*, 2014 WL 932514, at *6; *Versatile*, 2011 WL 5119259, at *28. Accordingly, Claims 1(a) and 3(a) will be dismissed.

### 2. Free Exercise under the First Amendment

"RLUIPA provides considerably more protection for an inmate's religious exercise than does the Free Exercise Clause of the Constitution of the United States." *Shabazz v. Va. Dep't Corr.*, No. 3:10CV638, 2013 WL 1098102, at *9 (E.D. Va. Mar. 15, 2013) (internal quotation marks omitted) (citing *Lovelace*, 472 F.3d at 186). Thus, "[a] prison regulation that survives scrutiny under RLUIPA will also satisfy the First Amendment . . . ." *Charles v. Frank*, 101 F. App'x 634, 635 (7th Cir. 2004). Accordingly, because Defendants' actions pass muster under RLUIPA, Powers's related Free Exercise claims fail. Accordingly, Claims 1(b) and 3(b) will be dismissed. The Motion for Summary Judgment will be granted.

An appropriate Order shall accompany this Memorandum Opinion.

/s/

HENRY E. HUDSON
UNITED STATES DISTRICT JUDGE

Date: Sept. 17, 2014
Richmond, Virginia

22